IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In the Matter of the Seizure of<br><br>SUBJECT DOMAINS AND SUBJECT SERVERS AS FURTHER DESCRIBED IN ATTACHMENTS A-1 through A-3 | Case No. 3:26-mj-00252-KFR |

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Elliott Peterson, being duly sworn, hereby depose and state as follows:

### I.  INTRODUCTION

1.  I am a Special Agent ("SA") with the Defense Criminal Investigative Service ("DCIS") and have been so employed for approximately two years. I am currently assigned to the Cyber West Squad, where I specialize in the investigation of computer and high-technology crimes, including computer intrusions, denial of service attacks, and other types of malicious computer activity. I was previously employed with the FBI, where I had the same specialty, for approximately thirteen years. During my career as a Special Agent, I have participated in numerous cyber-related investigations, including investigations into the type of criminal activity described within this affidavit. In addition, I have received both formal and informal training from DCIS, the FBI, and other institutions regarding computer-related investigations and computer technology.

2.  I am familiar with the facts and circumstances described herein. This affidavit is based upon my personal involvement in this investigation, my training and experience, and information obtained from various law enforcement personnel and witnesses, including information that has been reported to me either directly or indirectly.

Apr 14, 2026

This affidavit does not purport to set forth my complete knowledge or understanding of the facts related to this investigation. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only. All figures, dates, times, and calculations set forth herein are approximate.

## II.  PURPOSE OF AFFIDAVIT

3.      This affidavit is presented in support of application for a warrant to seize the domain names and associated Cloudflare Zones (collectively referred to as the "SUBJECT DOMAINS", and listed in the chart below), and the servers (collectively referred to as the "SUBJECT SERVERS," and listed in the chart below). As discussed below, the SUBJECT DOMAINS and SUBJECT SERVERS are currently being utilized as infrastructure dedicated to the operation of criminal distributed denial of service (DDoS) platforms. There is no evidence that any of the SUBJECT DOMAINS and SUBJECT SERVERS have a non-criminal purpose.

4.      These seizures shall be effected by associating the authoritative name servers for the SUBJECT DOMAIN names to government-controlled name servers, as described in detail within Attachments A-1, updating Cloudflare records to freeze the Cloudflare Zone records associated with the SUBJECT DOMAIN names, as described in detail within Attachment A-2, and by effecting a search and seizure by the US hosting provider Vercel, Inc., as described within Attachment A-3.

5.      The SUBJECT DOMAIN mythicalstress[.]com is associated with the registry Verisign, Inc., 12061 Bluemont Way, Reston, VA 20190 (Attachment A-1).

Apr 14, 2026

Case 3:26-mj-00252-KFR *SEALED* Document 1 Filed 04/14/26 Page 2 of 29

6. All of the SUBJECT DOMAINS utilize Cloudflare, Inc.'s reverse proxy services. Cloudflare accepts service at Cloudflare, Inc., 101 Townsend St, San Francisco, CA 94107 (Attachment A-2).

7. All of the SUBJECT SERVERS utilize IP addresses at the hosting provider Vercel, Inc., 650 California St, San Francisco, CA 94108 (Attachment A-3).

8. The chart below lists each of the criminal booter services (DDoS Service Description); associated domain or IP; Provider; and reference.

| DDoS Service Description | Domain or IP Address | Provider | Affidavit Description |
|---|---|---|---|
| Dreams-stresser[.]su | Dreams-stresser[.]su | Cloudflare | SUBJECT DOMAIN |
| mythicalstress[.]com | mythicalstress[.]com | Cloudflare | SUBJECT DOMAIN |
| mythicalstress[.]com | mythicalstress[.]com | Verisign | SUBJECT DOMAIN |
| stresse[.]su | stresse[.]su | Cloudflare | SUBJECT DOMAIN |
| vacstresser[.]ru | vacstresser[.]ru | Cloudflare | SUBJECT DOMAIN |
| quantum-stress[.]net | 216.198.79.1 (4/14/2026 10:31:00 UTC) | Vercel | SUBJECT SERVER |
| stresse[.]st | 216.198.79.1 (4/14/2026 10:31:00 UTC) | Vercel | SUBJECT SERVER |

Apr 14, 2026

3:26-mj-00252-KFR 3

Case 3:26-mj-00252-KFR *SEALED* Document 1 Filed 04/14/26 Page 3 of 29

| Unknownstresser[.]su | 216.150.1.1 (4/14/2026 10:31:00 UTC) | Vercel | SUBJECT SERVER |
|---|---|---|---|
| Vacstresser[.]net | 216.198.79.1 (4/14/2026 10:31:00 UTC) | Vercel | SUBJECT SERVER |

### III. SUMMARY OF RELEVANT COMPUTER AND INTERNET CONCEPTS

9. The information provided below regarding relevant computer and internet concepts is based on my training and experience and publicly available information:

a. <u>Internet Protocol address:</u> an Internet Protocol address, or "IP address," is a unique numeric address used to identify computers on the Internet. The standard format[1] for IP addressing consists of four numbers between 0 and 255 separated by dots, *e.g.*, 149.101.10.40. Every computer connected to the Internet (or group of computers using the same account to access the Internet) must be assigned an IP address so that Internet traffic sent from and directed to that computer is directed properly from its source to its destination. Internet Service Providers ("ISPs") assign IP addresses to their customers' computers.

10. <u>Domain Name:</u> A domain name is a text-based label that serves to identify Internet resources, such as computers, networks, and services, in a way that is easier to

---

[1] IP version 4, or "IPv4", is the version of IP most commonly used today, and is the version described above. A newer version of the protocol, "IPv6", wholly different in appearance to IPv4, is sometimes used, but does not pertain to this request, and will not be referred to further.

Apr 14, 2026

Case 3:26-mj-00252-KFR *SEALED* Document 1 Filed 04/14/26 Page 4 of 29

remember than an IP address. For example, "google.com" and "cacd.uscourts.gov" are domain names.

11.    <u>Domain Name System:</u> The domain name system ("DNS") is, among other things, a hierarchical convention for domain names. Domain names are composed of one or more parts, or "labels," that are delimited by periods. The hierarchy of domains descends from right to left; each label to the left specifies a subdivision, or subdomain, of the domain on the right. The right-most label conveys the "*top-level*" *domain*, or TLD. For the example of google.com, ".com" is the top-level domain, and "google" is the second-level domain. In the cacd.uscourts.gov example, ".gov" is the top-level domain, ".uscourts" is the second-level domain, and "cacd" is the third-level domain (also called a subdomain), with each being a subdivision of the one to its right.

12.    <u>Server:</u> a server is a centralized computer that provides services for other computers connected to it through a network. The computers that use the server's services are sometimes called "clients." Server computers can be physically located anywhere. For example, it is not uncommon for a network's server to be located hundreds, or even thousands of miles away from the client computers.

13.    <u>Name Servers:</u> Name servers are particular servers which function like a phonebook. Name servers will accept queries for domain names (such as google.com) and return the IP address associated with the domain, much as the name John Doe might be looked up in a telephone book to determine the corresponding telephone number.

//

//

Apr 14, 2026

Case 3:26-mj-00252 *SEALED* Document 1 Filed 04/14/26 Page 5 of 29

14.	Registry: A registry is a company responsible for managing the assignment of domains to IP addresses within a top-level domain. For example, the registry for the ".com" and ".net" top-level domains is VeriSign, Inc.

15.	Registrar: Domain names are usually purchased through a registrar, which acts as the intermediary between the registry and the purchaser of a domain name. Companies such as NameCheap, GoDaddy, and Domain.com are registrars, though which a person can purchase a particular domain name to host a website (among other things). For example, if a person, Entrepreneur A, wishes to run a website to sell widgets, they might purchase the domain "widgets-R-us.com" from a registrar like NameCheap, which acts as an intermediary between that customer and Verisign, Inc.

16.	Registrant: The individual or business that purchases a domain name is called a registrant. Registrants control the IP address, and thus the computer, to which their domain name resolves. In the example above, Entrepreneur A is the registrant. Once Entrepreneur A purchases the domain widgets-R-us.com, they can host their website anywhere they wish, and the widgets-R-us.com domain will be associated with whatever IP address is assigned to the computer (server) they use to host that website.

17.	WHOIS: WHOIS is a query-and-response protocol that is publicly available and widely used for querying databases that store the registered users or assignees of an Internet resource, such as a domain name or IP address block. WHOIS query responses provide the contact information for the individual responsible for registering the domain name or the Internet Service Provider ("ISP") which owns the IP block.

//

Apr 14. 2026

Case 3:26-mj-00252-KFR *SEALED* Document 1 Filed 04/14/26 Page 6 of 29

18.    Distributed Denial of Service/DDoS attacks: a DDoS attack is a type of network attack in which multiple Internet-enabled devices are used to attack computers for the purpose of rendering them inaccessible to legitimate users or unable to communicate with the Internet. One form of DDoS attack used in this investigation is the flooding of a website or server with internet traffic which makes the targeted website unable to be accessed by or to communicate with legitimate users or customers.

19.    Cloudflare: Cloudflare is a US technology company which provides pass-through security and performance services that generally exist between Internet users and the online resource they are accessing ("origin servers"). Cloudflare calls this a reverse-proxy service. The vast majority of the SUBJECT DOMAINS are using Cloudflare's reverse proxy services (as do many U.S. government websites), likely because of the built in DDoS defense technologies employed by Cloudflare. In the case of SUBJECT DOMAINS which are utilizing only Cloudflare's reverse proxy services, Cloudflare does not control the content associated with the SUBJECT DOMAINS, and cannot remove it from the Internet, and also cannot transfer control of the SUBJECT DOMAINS. In those cases in which the hosting providers and registrars of the SUBJECT DOMAINS are not subject to the jurisdiction of this court or otherwise fail to take action, Cloudflare can terminate services which would force the registered users (i.e. booter service owners) of the SUJBECT DOMAINS to procure different reverse-proxy services, likely at an increased financial cost to these users.

20.    Booter/Stresser Service: A booter or stresser is a service, usually offered via a website, that allows customers to conduct DDoS attacks on other Internet-connected

Apr 14. 2026

Case 3:26-mj-00252-KFR *SEALED* Document 1 Filed 04/14/26 Page 7 of 29

computers or servers. These services are so named because they result in the "booting" or dropping of the victim computer from ongoing Internet connections, because the victim computer or its router receives a quantity of internet traffic which exceeds either its processing or its routing capabilities. Some sites use the term "stresser" in an effort to suggest that the service could be used to test the resilience of one's own infrastructure; however, as described below, I believe this is a façade and that these services exist to conduct DDoS attacks on victim computers not controlled by the attacker, and without the authorization of the victim.

## IV. APPLICABLE LAW

21. There is probable cause to believe that the SUBJECT DOMAINS are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 981(b) and (a)(1)(A) because the SUBJECT DOMAINS were involved in one or more violations of 18 U.S.C. § 1956(a)(2) (International Money Laundering), done with the intent to promote the underlying specified unlawful activity, namely 18 U.S.C. § 1030(a)(5)(A) (Unauthorized Impairment of a Protected Computer) as defined by 18 U.S.C. § 1956(c)(7)(D).

22. Furthermore, there is probable cause to believe that the SUBJECT DOMAINS are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. 1030(i)(1)(A) because the SUBJECT DOMAINS constitute personal property used or intended to be used to facilitate the commission of attacks against unwitting victims for the express purpose of preventing the victims from properly using the Internet, in

Apr 14, 2026

Case 3:26-mj-00252-*SEALED Document 1 Filed 04/14/26 Page 8 of 29

violation of 18 U.S.C. § 1030(a)(5)(A) (Unauthorized Impairment of a Protected Computer).

23. In addition, the SUBJECT DOMAINS are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 982(b)(1), and 21 U.S.C. § 853(f), because there is probable cause to believe that a protective order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture because there is reason to believe that the property is under the control of the targets of this investigation, who cannot reasonably be relied upon to abide by an order to maintain the property in substantially the same condition as it is at the present time, in order to ensure that it will be available for forfeiture. More particularly, providing notice may allow the targets to frustrate further efforts of law enforcement by transitioning their enterprise and infrastructure to jurisdictions beyond the reach of United States law enforcement.

## V. **SUMMARY OF PROBABLE CAUSE**

24. Each of the SUBJECT DOMAINS and SUBJECT SERVERS listed in the Appendix is used by a website that offers for-hire DDoS attack services, known commonly as a "booter" service. In general, that means that customers pay money to the administrator/s of each site in order to launch DDoS attacks against victim computers. As described below, each site was tested by DCIS personnel, or their international LE partners, meaning that agents or other personnel created accounts on the websites, and in most cases, paid for a subscription plan, and then directed DDoS attacks against computers principally located in the Los Angeles area which were controlled by DCIS or their international partners, and for which law enforcement officers had previously sought and

Apr 14, 2026

3:26-mj-00252-KFR                    9

received consent from the computers' owners. The DDoS services are currently the subject of criminal investigations in the District of Alaska. These seizures of SUBJECT DOMAINS and seizures and searches of SUBJECT SERVERS are being conducted as part of an overall international operation targeting DDoS services worldwide. This operation, known by EUROPOL as "PowerOff", has included rolling arrests and seizures of DDoS infrastructure, including domains, servers, and cryptocurrency used to facilitate these DDoS-for-hire services. Additionally, many law enforcement agencies, are sending deterrence messaging to historical customers of DDoS services notifying users of criminal nature of these DDoS-for-hire services.

25. In terms of the investigative methodology, each of the SUBJECT DOMAINS and SUBJECT SERVERS were initially identified as a potential DDoS service through descriptions contained on the booter website itself, marketing on known DDoS sale platforms, or through previous law enforcement or private industry investigation.

26. Each of the SUBJECT DOMAINS was found, through law enforcement testing, to launch DDoS attacks, or to redirect (i.e. transfer the user) to another website that launches DDoS attacks.

27. None of these sites ever required DCIS personnel to confirm that it owned, operated, or had any property right to the computer that was attacked during its testing (as would be appropriate if the attacks were for a legitimate or authorized purpose). From my training and experience investigating these threat actors, there is in fact no legitimate non-criminal purpose for these so-called "booter" or "stresser" services.

//

Apr 14, 2026

Case 3:26-mj-00252-*SEALED* Document 1 Filed 04/14/26 Page 20 of 29

28. Additionally, analysis of data related to the DCIS-initiated attacks revealed that the attacks launched by the SUBJECT DOMAINS and SUBJECT SERVERS involved the extensive misuse of third-party services. Specifically, all of the tested services offered "amplification" attacks, where the attack traffic is amplified through unwitting third-party servers in order to increase the overall attack size, and to shift the financial burden of generating and transmitting all of that data away from the booter site administrator(s) and onto third parties.

29. Each of the SUBJECT DOMAINS and SUBJECT SERVERS tested by law enforcement represents property involved in international financial transactions between and through places inside and places outside of the United States because the purchase and operation of the involved domain names, hosting services, and customers necessarily cross the borders of the United States, for the purpose of promoting the above-described illegal activities.

30. Furthermore, each of the SUBJECT DOMAINS and SUBJECT SERVERS tested by law enforcement represents property used to facilitate the commission of attacks initiated from or targeted protected computer systems located within the District of Alaska for the express purpose of preventing the victims from properly using the Internet.

## VI.   STATEMENT OF PROBABLE CAUSE

### A.   DCIS Investigation into Booter and Stresser Services

31. DCIS, in conjunction with many domestic and international law enforcement agencies, has been investigating the use of "booter" services (also called "stresser" services) to direct floods of misappropriated Internet traffic to victims for the express

_Apr 14, 2026_

3:26-mj-00252-KER                    11

Case 3:26-mj-00252-KER *SEALED* Document 1 Filed 04/14/26 Page 11 of 29

purpose of preventing the victims from accessing the Internet, or degrading or severing the victims' current access to the Internet or Internet services, contrary to law.

## B. Booter/Stresser Service Operation

32. Based on my training and experience, booter-based DDoS attack tools represent an increasingly effective and burdensome Internet attack technology. These services provide a low barrier to entry for their customers, offering large and impactful attacks for a relatively nominal monthly fee. These services primarily accept quasi-anonymous payment mechanisms, such as various cryptocurrencies. Some accept more traditional online payment mechanisms such as PayPal or Google Wallet, although they do so in violation of the terms of service for such providers. Previous work by law enforcement and private sector partners has reduced the ability of these services to rely on more traditional payment services.

33. Based on my investigation to date, the rates charged to customers by booter services vary according to the specific service, the desired "bandwidth" or attack size, the attack type, the attack duration, and the number of "concurrent" attacks allowed. For example, a premium, or "VIP," account on a given booter service might cost $100 a month and allow access to ten or more attack types, a peak attack bandwidth of 30 Gigabits per second (Gbit/s), and the ability to attack up to four IP addresses at one time, with attacks lasting an hour or more. A "basic" plan might cost $25 to $35 a month and provide a more limited number of attack types, while allowing the customer to attack only a single IP address at a time.

//

Apr 14, 2026

Case 3:26-mj-00252-KFR *SEALED* Document 1 Filed 04/14/26 Page 12 of 29
Case 3:26-mj-00252-KFR Document 1-1 Filed 04/14/26 Page 22 of 29

34.     Most booter services advertise their attack capabilities publicly, on their own web pages, on third party websites, on criminal forums, on various chat platforms such as Telegram, or with video services such as YouTube. These advertisements are usually explicit, describing peak attack bandwidth, as well as naming Internet hosting companies which they claim to be capable of disrupting with their attacks. Some booter services operate their own attack architecture, which normally consists of one or more "attack servers" at hosting providers that allow the modification of IP header packets (a practice known as "spoofing," described in more detail below). Other booter operators rely on third parties, normally operators of larger booter services, to provide these "attack servers."

35.     It should be noted that some booter services I have reviewed will offer some token language within their Terms of Service that attempts to absolve the booter service from responsibility for attacks launched by their customers. This language may include statements such as, "Under this license you may not intentionally send a DDoS flood to an IP address not owned by yourself." Based on my training and experience, I believe this language is essentially a pretense. Other language on the websites themselves often makes clear that the administrator/s and users are well aware of the true purpose of the sites. For example, terms like "attack," "destroy," "beg for mercy," "drop," "lag," and "down" (as in "down," or "take down" a site or computer) make clear that the purpose of the site is precisely to attack computers not owned by the attacker; they would be nonsensical in the context of a person flooding their own network or computer for testing purposes. Further, because the kinds of DDoS attacks used by these services (described below) by

Apr 14, 2026

Case 3:26-mj-00252-KFR *SEALED* Document 1 Filed 04/14/26 Page 29 of 29

definition rely upon vulnerable third-party services to act as "amplifiers," they must flood traffic to those external services en route to the victim, potentially affecting the communications of such servers. Furthermore, some of the booter services I investigated offered services known as "resolvers" - the purpose of which is to obtain the IP address of a victim; such resolvers would be entirely unnecessary if any customer was targeting their own infrastructure, as they would be aware of their own IP address. In addition, I have reviewed thousands of communications between booter site administrators and their customers; these communications make clear that both parties are aware that the customer is not attempting to attack their own computers. I have frequently observed communications like, "help me take this [site] down," or, "I can't down this server, what am I doing wrong?" or, "what kind of attack will work best against [a particular] type of server?" or many other similar requests that clearly indicate the customer does not own the victim computer. Finally, through interviews with many operators of these service, as well as analysis of logs associated with the operation of the services, I know that most of the administrators (and/or their employees) have themselves conducted unauthorized attacks using their own services, against computers for which they did not have ownership or consent. I therefore believe that the terms of use language for these booter sites is simply a (poor) attempt by the administrators to insulate themselves from liability.

## C.   Booter/Stresser Attack Methodology

36.   Based upon my training and experience, I know that of the types of DDoS attacks offered by booter sites, among the largest, in terms of sheer volume, tend to be Reflective Amplification Attacks ("RAA"). RAA DDoS attacks function as follows:

Apr 14, 2026

Case 3:26-mj-00252-KFR Document 1 Filed 04/14/26 Page 14 of 29

37.     First, the attacker learns the victim's IP address. This can be done through a variety of methods, including "resolvers" offered by the booter sites themselves. These resolvers can, for example, discover the true IP associated with a web server so that an attack can bypass anti-DDoS defenses such as Cloudflare, determine on which IP address a given website or domain is hosted, or determine an IP address associated with a given Skype username.

38.     Second, the attacker chooses an attack method, often named after an Internet protocol, *i.e.*, a type of communication between computers. The particular protocols used by booters are vulnerable to abuse because they enable the attacker to send a very small request to a third party and get a very large response (known as "amplification"), and to do so without the double-checking parameters used for many other types of Internet communication. There are several such Internet services which - though created for legitimate purposes - are commonly misused by booter services to craft large RAA DDoS attacks. Examples include SSDP, also known as Simple Service Discovery Protocol, which allows for the advertisement and discovery of network services; NTP, or Network Time Protocol, which allows clock synchronization between computer systems; DNS, or Domain Name System, which facilitates the translation of domain names to IP addresses; and Chargen, or Character Generation Protocol, which facilitates testing and debugging. Many servers communicating with the Internet around the world are configured to provide services using these protocols to any computer that requests such data; they have no connection to the booter services but can be vulnerable to abuse by them.

Apr 14, 2026

//

3:26-mj-00252-KFR                    15

Case 3:26-mj-00252-KFR *SEALED* Document 1 Filed 04/14/26 Page 25 of 29

39.     In the third and final step, the booter website crafts and sends a request using one of the aforementioned protocols, but in doing so "spoofs" the origin of the request by modifying the IP packet header: rather than using the attacker's own IP address, the attacker fraudulently indicates that the source of the request is actually the victim's IP address. When the third-party service receives the request, it is tricked by this "spoofed" origin IP. This results in the response being transmitted from the third party to the victim, rather than back to the attacker.[2] This process is called "reflection" and the abused servers are called "reflectors" because of this effect of bouncing, or reflecting, the response to the victim rather than back to the attacker.

40.     As noted above, "amplification" is a key part of this process. By abusing these particular protocols, the attacker crafts a request in such a way that the third-party response to the attacker's query is 10, 20, or even 100 times larger than the initiating request.  This effect is intentional, and it allows the booter operator to pass the majority of costs that would otherwise be associated with generating and transmitting such large quantities of data over to the third parties and, in some cases, the victim.

//

---

[2]In fact, servers that allow this IP packet header modification are so central to the operation of Booter services that they are commonly referred to as "spoof" servers. I have worked extensively with representatives of academic institutions and various private sector companies to reduce the availability of these services. In addition, concurrent to this investigation, academic institutions and private sector companies have developed methods to track these attacks back to the networks that are initiating them, something that many booter operators believed was impossible. These institutions and companies have succeeded in reducing the number of ISPs that are providing these "spoof servers," and allowing them to be abused to launch DDoS attacks.

Apr 14, 2026

3:26-mj-00252-KFR                    16

41.     The last component of an RAA is one of distribution. Instead of issuing the query to a single third-party reflector, the query may be issued to hundreds or thousands of such third-party reflectors simultaneously, each of which return with "amplified" responses. The resulting deluge of attack data saturates the network connection of the victim target website, and often negatively affects many other Internet users or servers that stand between the attacker and the victim.

### D.      Effects of Booters

42.     I have interviewed many of the preeminent experts in the field of Internet attack technology, including those at domestic ISPs who often observe thousands of attacks a day. From these interviews, I have learned that some domestic ISPs use networking hardware known as an "aggregator" to bundle downstream customer accounts; that one common network implementation results in up to 10,000 domestic ISP customers downstream of a single aggregator; and that many aggregators can only sustain incoming Internet traffic volume of 40 Gbit/s and below. Internet traffic exceeding 40 Gbit/s thus can result in the inability of an aggregator to route any further traffic, which could negatively impact the Internet service of all 10,000 customers downstream from that aggregator. Larger attacks can have even more severe effects. Many attacks associated with booter services are smaller, often significantly so, in the range of 100 Mbit/s to 10 Gbit/s. But these attacks still meaningfully degrade or disrupt many types of Internet service, including most residential Internet connections. I often work with victims in the aftermath of large DDoS attacks events, and it isn't uncommon for the victims to feel compelled to purchase additional Internet capacity and DDoS defense services that cost thousands of

Apr 14, 2026

dollars a month, in the hopes of mitigating future DDoS attacks. This is often described as "overprovisioning". The prices to overprovision are often at a scale of 100:1, or more, compared to the cost to conduct attacks using a given booter service. This disparity in the price of defending versus the price of attacking creates an additional burden for victims of these services.

43. I have conducted extensive interviews of victims of DDoS attacks, including those conducted by booter services, as well as academics and private-sector researchers who study this problem. I have also reviewed many communications between booter service operators and their customers. I know that while many of the attacks are short in duration, lasting only minutes, the cumulative impact of such attacks creates additional burdens and costs for many ISPs. I have interviewed victims of DDoS attacks who have assessed operational losses measured in the hundreds of thousands, and even millions, of dollars. I have interviewed representatives of ISPs who have been concerned that the cumulative effect of ongoing DDoS attacks was going to put them out of business, because the net cost of purchasing additional capacity was likely to push their subscription costs higher than they felt their customers would bear.

**E. DCIS Testing Confirmed that the SUBJECT DOMAINS and SUBJECT SERVERS Operated as Illegal Booter and/or Stresser Services.**

44. So far in 2026, DCIS personnel have visited approximately 100 booter sites that specifically purported to sell DDoS services, including each of the SUBJECT DOMAINS and SUBJECT SERVERS. A number of these booter sites offered free attacks, although generally with limited functionality or availability. In most cases,

Apr 14, 2026

I or other law enforcement personnel paid for a subscription, generally opting for the lowest (cheapest) available tier of service.

45. I know from previous investigations and consultations with Internet security experts who specialize in DDoS services that many booter services have poorly functioning Application Program Interfaces ("APIs"). As a result of the poorly functioning APIs, not all booter services function properly with 100% consistency, nor are they certain to deliver the promised attack volumes and types. Therefore, not all testing was expected to be successful, nor was it. The list of SUBJECT DOMAINS only includes those services for which the DCIS's analysis determined that the websites offered DDoS services for sale, or redirected to another website offering DDoS services for sale, and for which DCIS testing showed that the website actually functioned: that is, quantifiable data (i.e. Internet Protocol packets) was generated as a result of our "attack" and was transmitted to our "victim" computer.

46. All of the SUBJECT DOMAINS offered a selection of attack protocols, including protocols which I recognize as commonly associated with RAAs (as described above, Reflective Amplification Attacks) and which were commonly labeled things like NTP, DNS, CHARGEN, and UDP (this last is a category of protocols including, but not limited to, the first three). In each case, the test attacks targeted protected computer systems located within the Central District of California and the District of Alaska.

47. A test attack, and therefore the booter service that launched it, was considered successful if the attack was observed at the "victim" computer and it generated a sufficient quantity of "packets," or raw data, to reasonably have caused damage to a protected

Apr 14, 2026

3:26-mj-00252-KFR                    19

computer. DCIS personnel examined data generated during these tests, to confirm that the captured data generally matched the characteristics of our testing; for example, that an attack was sent to the right IP address and the correct port number, and that it was sent in a time period that overlapped with our testing. Despite the fact that our test computer was located on a network with a large amount of network capacity, there were times that the DDoS attacks actually severed our remote connection, due to the attack's power.

48. Below is a screenshot for the website "mythicalstress[]com". Describing itself as "the best stress tool in 2026", the website purports to offer both Layer 4 and Layer 7 attack techniques and notes that it is a "Cheap DDoS-for-Hire Tool". Based upon my training and experience I know that Layer 4 and Layer 7 refer to DDoS attacks using User Datagram Protocol (UDP) and Transmission Control Protocol (TCP), respectively.

//

//

//

//

//

//

//

//

//

//

Apr 14, 2026



49. Relative to its description as "cheap", The most affordable plan (the "Gold" plan) offered by mythicalstress[.]com starts at $45 for one month of attacks, allows attacking up to three victim IP addresses at a time, and an attack duration of 2400 seconds (i.e. 40 minutes). The most expensive plan is labeled "Advanced Supreme Luxury", costs $950 per month, allows for the simultaneous attack of up to 90 victim IPs, and for each DDoS attack to last over 500 hours.

50. Based on my testing of mythicalstress[.]com, as well as the testing of partners, I know that it launches DDoS attacks. A screenshot of the website's "Attack Hub" appears below. A banner that runs across the top of the page notes that today

Apr 14, 2026

Case 3:26-mj-00252-KFR *SEALED* Document 1 Filed 04/14/26 Page 21 of 29

(i.e. April 13th, 2026) the service has launched over 4,000 DDoS attacks, with a monthly DDoS attack count of over 700,000 attacks. The website does purport to limit some types of DDoS attacks in their Terms of Service, nothing that "Attacking a Government Website will result in a ban!". Later in the terms of service, it is noted that "Mythical Service is a group of people that work on making DDOS Attacks easy for everyone."



51.     Each of the other SUBJECT DOMAINS, i.e. dreams-stresser[.]su, vacstresser[.]ru, and stresse[.]su, function essentially identically to mythicalstresser[.]com. Vacstresser[.]ru has plans starting at $14 dollars a month ("Hydrogen" plan), while the Radium plan, which offers "premium" DDoS attack methods, attacks which can last over 100 hours, and the ability to simultaneously attack up to 45 victims, costs $476 per month. Vacstresser[.]ru also displays cumulative counts of DDoS attacks, logging tens of thousands in normal days. Vacstresser[.]ru claims that across the lifetime of its service it has been used to launch over 142 million DDoS attacks. In my training and experience

Apr 14, 2026

Case 3:26-mj-00252-KFR *SEALED* Document 1 Filed 04/14/26 Page 22 of 29

these estimates are consistent with top DDoS services that have been in operation for multiple years. When I have examined recovered DDoS service databases, those databases often depict thousands of attacks launched daily targeting victims located in the United States and abroad. Dreams-stresser[.]su describes itself as a "Powerful Stress Testing Platform!" with "powerful layer 4, layer7, game exploit, OVH bypass, DDoS-services + free hub". Based upon my training and I know that "game exploit" refers to DDoS methods designed to impair the functioning of specific online games, while "free hub" means that there are features that allow for "free" attacks, a common sales technique used by DDoS services to whet the appetite of prospective customers. Stresse[.]su provides no information on their public webpage besides prompts to login or register. Upon login, Stresse provides DDoS attack tools ranging in price from 200 to 12000 Euros. 200 Euros buys a user one month's access to up to three simultaneous DDoS attacks lasting up to one hour in length. 12000 Euros provides a user one month's access to 200 simultaneous attacks which can each last up to 30 days, as well as premium attack methods. The stresse[.]su website also contains within the "News" feed references to previous government actions. A prior version of this website was seized in December 2022. The news feed describes this as "problems with the registrar", and directs customers to a new domain at "stresse[.]app." The stresse[.]app domain is presently configured to redirect visitors to stresse[.]su, i.e. one of the SUBJECT DOMAINS.

52.     Each of the SUBJECT SERVERS corresponds to a booter or stresser service. This information was provided by Cloudflare in the form of "A records", or the record of which IP address is mapped to a given domain. The SUBJECT SERVERS correspond to

Case 3:26-mj-00252-KER *SEALED* Document 1 Filed 04/14/26 Page 29 of 29

Apr 14, 2026

booter services as follows: quantum-stresser[.]net (Vercel Inc. IP address 216.198.79.1), stresse[.]st (Vercel Inc. IP address 216.198.79.1), unknownstresser[.]ru (Vercel Inc. IP address 216.150.1.1), and vacstresser[.]net (Vercel Inc. IP address 216.198.79.1). In other words, three of the domains correspond to the same IP address (quantum-stresser[.]net, stresse[.]st, and vacstresser[.]net). The three domains sharing the same IP address is a strong indicator that all three are operated by the same individual. All of the listed domains, with the exception of quantum-stresser[.]net, have been tested by law enforcement personnel and found to function, i.e. to deliver DDoS attacks. Quantum-stresser[.]net has not been tested because it redirects, i.e. automatically transfers users, to the website vacstresser[.]ru, i.e. one of the SUBJECT domains, which has been tested, and is a functioning DDoS service.

## F.    SEARCH OF THE SUBJECT SERVERS HOSTED BY VERCEL

53.    Each of the SUBJECT SERVERS corresponds to one or more functioning DDoS services and terminating their service via the seizure reflected within Attachment A-3 will interrupt the functioning of the DDOS server. Based on the recent testing regime described above, including review of the public facing website, covert law enforcement registration as users on the website, the purchase of a subscription plan via cryptocurrency payment (if a "free" plan was not available), and verification of their DDoS attack capacity through methodological testing, there is probable cause to believe a search of the SUBJECT SERVERS is likely to reveal more information on the operation of their associated DDoS services. This the aforementioned examples, i.e. viewing the website, signing up for a plan, making payment, all occurred on or through services coordinated by

Apr 14, 2026

Case 3:26-mj-00252-KFR *SEALED* Document 1 Filed 04/14/26 Page 24 of 29

the website, which is maintained on the Vercel Inc. SUBJECT SERVERS. I have previously reviewed server images for DDoS services and found that they commonly contain website configuration information such as the source code for the website, as well as things like payment records, correspondence between the service administrators and their customers, often in the form of a ticketing system, logs of issued DDoS attacks, and other information that can assist law enforcement in the identification of the service administrators or their customers.

54. Web hosting and Internet Service Provider (ISP) companies, such as Vercel Inc. maintain server computers connected to the Internet. Their customers use those computers to operate websites on the Internet.

55. In general, web hosting and ISP companies like Vercel Inc. ask each of their customers to provide certain personal identifying information when registering for an account. This information can include the customer's full name, physical address, telephone number and other identifiers, e-mail addresses, and business information. Web hosting and ISP companies also may retain records of the length of service (including start date) and types of services utilized. In addition, for paying customers, web hosting companies typically retain information about the customers' means and source of payment for services (including any credit card or bank account number).

56. Web hosting and ISP companies' customers place files, software code, databases, and other data on the servers. To do this, customers connect from their own computers to the server computers across the Internet. This connection can occur in several ways. In some situations, it is possible for a customer to upload files using a special web

Case 3:26-mj-00252-KFR *SEALED* Document 1 Filed 04/14/26 Page 29 of 29

Apr 14, 2026

site interface offered by the web hosting company. It is frequently also possible for the customer to directly access the server computer through the Secure Shell ("SSH") or Telnet protocols. These protocols allow remote users to type commands to the web server. The SSH protocol can also be used to copy files to the server. Customers can also upload files through a different protocol, known as File Transfer Protocol ("FTP"). Servers often maintain logs of SSH, Telnet, and FTP connections, showing the dates and times of the connections, the method of connecting, and the Internet Protocol addresses ("IP addresses") of the remote users' computers (IP addresses are used to identify computers connected to the Internet). Servers also commonly log the port number associated with the connection. Port numbers assist computers in determining how to interpret incoming and outgoing data. For example, SSH, Telnet, and FTP are generally assigned to different ports.

57. The servers use those files, software code, databases, and other data to respond to requests from Internet users for pages or other resources from the website. Commonly used terms to describe types of files sent by a server include HyperText Markup Language ("HTML") (a markup language for web content), Cascading Style Sheets ("CSS") (a language for styling web content), JavaScript (a programming language for code run on the client's browser), and image files. Web hosting and ISP companies frequently allow their customers to store collections of data in databases. Software running on the web server maintains those databases; two common such programs are named MySQL and PostgreSQL, although these are not the only ones.

//

Apr 14, 2026

//

Case 3:26-mj-00252-KFR *SEALED* Document 1-1 Filed 04/14/26 Page 26 of 29

58. Web hosting and ISP companies sometimes also provide their customers with e-mail accounts; contents of those accounts are also stored on the web hosting company's servers.

59. Web sites deliver their content to users through the Hypertext Transfer Protocol ("HTTP"). Every request for a page, image file, or other resource is made through an HTTP request between the client and the server. The server sometimes keeps a log of all of these HTTP requests that shows the client's IP address, the file or resource requested, the date and time of the request, and other related information, such as the type of Web browser the client uses.

60. In some cases, a subscriber or user will communicate directly with a web hosting company about issues relating to a website or account, such as technical problems, billing inquiries, or complaints from other users. Web hosting companies typically retain records about such communications, including records of contacts between the user and the company's support services, as well records of any actions taken by the company or user as a result of the communications.

61. Accordingly, each of the SUBJECT DOMAINS and SUBJECT SERVERS are involved in the operation of criminal DDoS-for-hire services. Each SUBJECT DOMAIN and SUBJECT SERVER is being used to facilitate the commission of attacks against unwitting victims to prevent the victims from accessing the Internet, to disconnect the victim from or degrade communication with established Internet connections, or to cause other similar damage. I have consulted with representatives of

Apr 14, 2026

3:26-mj-00252-KFR

Case 3:26-mj-00252-KFR *SEALED* Document 1 Filed 04/14/26 Page 27 of 29

Verisign, Cloudflare, and Vercel in advance of this application regarding the technical means necessary to achieve the seizure, as reflected in Attachments A-1 through A-3.

## VII.CONCLUSION

62. For the reasons stated above, there is probable cause to believe that the SUBJECT DOMAINS are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 981(b) and (a)(1)(A) because the SUBJECT DOMAINS were involved in one or more violations of 18 U.S.C. § 1956(a)(2) (International Money Laundering), done with the intent to promote the underlying specified unlawful activity, namely 18 U.S.C. § 1030(a)(5)(A) (Unauthorized Impairment of a Protected Computer) as defined by 18 U.S.C. § 1956(c)(7)(D).

63. Furthermore, there is probable cause to believe that the SUBJECT DOMAINS are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 1030(i)(1)(A) because the SUBJECT DOMAINS constitute personal property used or intended to be used to facilitate the commission of attacks against unwitting victims for the express purpose of preventing the victims from properly using the Internet, in violation of 18 U.S.C. § 1030(a)(5)(A) (Unauthorized Impairment of a Protected Computer).

64. In addition, the SUBJECT DOMAINS are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 982(b)(1), and 21 U.S.C. § 853(f), because there is probable cause to believe that a protective order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture because there is reason to believe that the property is under the control of the targets of this investigation,

Apr 14, 2026

3:26-mj-00252-KFR                    28

who cannot reasonably be relied upon to abide by an order to maintain the property in substantially the same condition as it is at the present time, in order to ensure that it will be available for forfeiture. More particularly, providing notice may allow the targets to frustrate further efforts of law enforcement by transitioning their enterprise and infrastructure to jurisdictions beyond the reach of United States law enforcement.

RESPTFULLY SUBMITTED,

ELLIOTT PETERSON
Special Agent
DCIS

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed.R.Crim. P. 4.1 and 41(d)(3) on this _____ day of _____, 2026.

HON. KYLE F. REARDON
United States Magistrate Judge
District of Alaska

April 14, 2026

3:26-mj-00252-KFR                     29

Case 3:26-mj-00252-KFR *SEALED* Document 1 Filed 04/14/26 Page 29 of 29